## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 21 CR 374 |
| Plaintiff, | ) | |
| | ) | U.S. Magistrate Judge Gabriel A. Fuentes |
| v. | ) | |
| | ) | |
| CLAYTON JEMINE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Federal Rule of Criminal Procedure 58(c) sets forth "Additional Procedures in Certain Petty Offense Cases." These "additional procedures" apply only to petty offenses "for which no sentence of imprisonment will be imposed." Fed. R. Crim. P. 58(c). Subparagraph (c)(2) of the rule provides for a defendant arrested, held, or present in a judicial district other than where he was charged to "state in writing a desire to plead guilty or nolo contendere; to waive venue and trial in the district where the proceeding is pending; and to consent to the court's disposing of the case in the district where the defendant was arrested, is held, or is present." Fed. R. Crim. P. 58(c)(2)(A). Once a defendant waives venue in this manner, and as long as he or she does not later plead not guilty, the rule provides that "the prosecution *will* proceed in this district where the defendant was arrested, is held, or is present." Fed. R. Crim. P. 58(c)(2)(B) (emphasis added).

This petty offense matter previously was transferred to the District of Arizona, the charging district, at an initial appearance and removal hearing on June 11, 2021. 6/11/21 Orders (D.E. 2, 9). Slightly more than four months later, the defendant, Clayton Jemine ("Defendant" or "Jemine"), invoked Rule 58(c)(2), asking this Court in the Northern District of Illinois, where Defendant is present, to re-assert jurisdiction, to transfer the matter back to this district, and to

conclude the prosecution here for plea and sentence. Notice of Intent to Plead Guilty and Waive Venue Pursuant to Rule 58(c) ("Notice of Intent"; D.E. 13). The government opposes adjudication of this matter here as improper forum shopping by Defendant and argues that the matter should stay in the District of Arizona. Response of the United States to Defendant's Memorandum Rule 58(c) Procedures ("Resp."; D.E. 22) at 14. The dispute calls upon the Court to examine the Rule 58(c) procedure closely and resolve some important questions, including how and when petty offense defendants must invoke the rule, whether the court in the transferor district (i.e., the district in which the defendant was arrested, is held, or is present) has the discretion to decline to re-assert jurisdiction over the matter upon a Rule 58(c)(3) notice, and whether the rule anticipates that the transferor court will make a pre-plea determination of the sentence in order to determine whether the prosecution may proceed in the transferor district. Perhaps because these questions or disputes about them rarely arise, few if any federal courts have addressed them squarely. Here, the Court answers those questions in support of a conclusion as to what now must happen in the wake of Defendant's notice of his intent to waive venue and plead guilty in this district.

## BACKGROUND

Defendant was arrested in the Northern District of Illinois on June 11, 2021, under a complaint that charged him with four counts of indecent exposure. The offenses were charged federally as misdemeanors under Arizona Revised Statute Section 13-1402(A), under the authority of 18 U.S.C. §§ 7(3) and 13 because the offenses are said to have occurred while Defendant was incarcerated in a federal penitentiary in the District of Arizona. Affidavit in Removal Proceeding (D.E. 1). His status as a federal prisoner resulted from his 2010 criminal prosecution in this district for bank robbery.

## I.      The Misdemeanor/Petty Offense Charges Filed in the District of Arizona

The federal complaint filed against Defendant in the District of Arizona alleged four separate counts of indecent exposure on July 25, 2019, November 12, 2018, October 20, 2020, and September 22, 2020. *Id.* The complaint stated that on those dates, and at the federal prison in Tucson, Arizona ("USP Tucson"), Defendant exposed his genitals in the presence of, respectively, a special education teacher, a case manager, a correctional systems officer, and a correctional officer, all while being reckless about whether those persons, as reasonable persons, were offended or alarmed by the act. *Id.* Each of the four victims was a female. Resp. at 4. The complaint, along with additional witness statements the government has provided (United States' Sentencing Memorandum ("Gov't Mem."; D.E. 30) at 1-4), alleged additional details about the charged offenses as follows:

- *Count One.* On July 25, 2019, Defendant exposed himself and masturbated in front of the special education teacher in the education leisure library at USP Tucson. He had been staring at the teacher, who told him to step into the hallway as she called for help from other prison staff. As Defendant got up from the table where he had been sitting and walked toward the door, he continued to masturbate, whereupon the teacher told him to stand at a wall with his hands against the wall. Defendant refused to do so, and then turned and took a step toward the teacher, continuing to stroke his male sex organ as he told her that he planned to commit an act of sexual intercourse upon her, and said, "you know you want this." The teacher gave a similar account in an internal Bureau of Prisons memorandum dated September 16, 2019. In the memorandum, the teacher further stated that after Defendant had left the library area and had entered the corridor, he "turned and charged me as he was masturbating and yelling that he was going to ---- me. I feared for my safety as I waited for additional staff to arrive." The internal memorandum is unlike those submitted as to the other three counts, in that (1) it is dated far closer in time to the incident, and (2) it is styled as a "threat assessment" and refers to Defendant being a "Care Level-I Mental Health inmate" who "fully understands his actions" and, in the opinion of the teacher, "if given the opportunity … would continue his behavior and threat of bodily harm." In the memorandum, the teacher referred to this behavior as "a direct threat on my safety and life."

- *Count Two.* In the first in time of the indecent exposures charged in the complaint, Defendant is said to have been in a cell he shared with another prisoner at USP Tucson on November 12, 2018, when a case manager stopped at the cell during rounds and noticed Defendant standing behind the other prisoner, staring at the case manager, and

masturbating with his male sex organ visible. The case manager ordered Defendant to stop, but he did not stop. In a BOP memorandum dated about two and a half years later, on May 14, 2021, the case manager added no other details except that she observed the alleged behavior after having asked the other prisoner to step aside.

- *Count Three.* This charged count represents the most recent of the alleged offenses. On October 20, 2020, Defendant is alleged to have exposed his genitals to a correctional systems officer as she was "conducting" legal mail in the special housing unit; she told him to stop, but he did not comply. The correctional systems officer's internal BOP memorandum about the incident was not submitted until May 14, 2021, the same date as the case manager's memorandum relating to the conduct alleged in Count Two. In the memorandum, the correctional systems officer wrote that after she had distributed the legal mail, she was standing near a cell in the special housing unit awaiting to be allowed to leave the area. Defendant was standing to the left of a shower near a door, and when the correctional systems officer approached the door, she observed him standing naked and masturbating. After she told him to stop, he did not stop and said "what?" before continuing to masturbate.

- *Count Four.* As a correctional officer was conducting a "safety and security round" outside Defendant's cell at 4:07 a.m. on September 22, 2020, Defendant told the officer that the cell toilet was leaking water into the cell, whereupon the officer shined a flashlight into the cell and saw Defendant masturbating. She told him to stop, but he did not comply. According to her internal BOP memorandum, the correctional officer reported that she did see water on the cell floor but thought that the water "was deliberately spilled as a ploy to get me to look in his cell." She reported no other "incidents" with Defendant before or after this event and added that before Defendant "was transferred out of" USP Tucson, he "apologize[d] for his actions." The internal memorandum was dated May 14, 2021.

Affidavit in Removal; Resp., Exhs. A-D.; Gov't Mem. at 1-4.[1]

The female victims in the four incidents submitted victim impact statements for the Court's consideration in determining whether this case involves a sentence of no imprisonment. Gov't Mem. at 1-4. Each victim advises that the respective events had a significant adverse and traumatizing impact on her. The victim in Count One reported suffering from post-traumatic stress disorder afterward, and that the event affected her home life and her intimate relationship with her husband. The incident has taken a toll on her mental health and her sense of safety at work, where

---

[1] It is not clear from the record precisely when Defendant "transferred out of" USP Tucson, but he did leave BOP custody on February 17, 2021. Bureau of Prisons Inmate Locator (https://www.bop.gov/inmateloc/) (visited Dec. 14, 2021).

she confronts on ongoing fear of being raped. The victim in Count Two related that the event was dehumanizing and caused her to have to take time off from work. She reports being angry about the event, and about how "nothing ever seems to happen" to prisoners who expose themselves to staff. The victim in Count Three also reported feelings of anger and helplessness, and she also reported being more cautious in her daily work routines. The Count Four victim said she avoids the USP Tucson Special Housing Unit ("SHU") now and has had lasting feelings of anger. All four of the victims have expressed that they believe Defendant's punishment should include time in custody, treatment, or both.

Defendant's release from BOP custody in February 2021 occurred after litigation in this district over whether he should receive early release under the First Step Act. The First Step Act litigation, and the underlying criminal bank robbery prosecution that resulted in Defendant's incarceration at USP Tucson, occurred before U.S. District Judge Gary Feinerman. Soon after Defendant's release from BOP custody in February 2021, Defendant returned to Chicago and began attending bi-weekly mental health and counseling sessions. Notice of Intent at 4; Sentencing Memorandum ("Def. Mem."; D.E. 31) at 4. He obtained employment as a machine operator in north suburban Gurnee, Illinois, and has been taking college-level classes in business administration. *Id.* Defendant reports, and the Court has confirmed, that no supervised release violation reports are on file for Defendant. The government has not disputed Defendant's account of his post-release conduct. Gov't Mem., *passim.* On May 17, 2021, three days after the submission dates of three of the four internal BOP memoranda, prosecutors in the District of Arizona filed the complaint. Affidavit in Removal.

## II.  Defendant's Bank Robbery Prosecution and First Step Act Litigation in the Northern District of Illinois

"Give me all the money from the bottom drawer," the man said to the bank teller.  It was November 5, 2010, at a TCF bank branch on Green Bay Road in the far northern Chicago suburb of Waukegan, Illinois.  "I have a gun.  Don't make any sudden movements."  On October 11, 2012, Defendant pleaded guilty in the Northern District of Illinois to being the man who uttered words to that effect and then walked out with $1,320 in cash that the teller had handed him in fear.  *United States v. Jemine*, No. 10 CR 947 (N.D. Ill.) ("Bank Robbery Prosecution"), Plea Agreement (D.E. 29, 30).  Four days after the Waukegan robbery, a man walked into another TCF branch, this time in the far northern suburb of Zion, Illinois, and told a teller that he did not want to do anything he would regret, so that the teller should "give me the money."  On the same day as his guilty plea to the Waukegan robbery, Defendant pleaded guilty to the Zion robbery and to using words to that effect, netting $660 in cash from another terrorized teller.  *Id.*

Judge Feinerman sentenced Defendant to 155 months of incarceration, applying a career offender advisory Sentencing Guideline and calculating Defendant's criminal history as Category VI and offense level at 29 for an advisory range of 151-188 months.  Bank Robbery Prosecution, 12/4/12 Tr. (D.E. 73) at 40, 48; 12/4/12 Judgment Order (D.E. 64).  Judge Feinerman considered the factors as required under 18 U.S.C. § 3553(a) and noted the evidence in mitigation including Defendant's difficult childhood and family background.  Bank Robbery Prosecution, 12/4/12 Tr. at 41-44.  Judge Feinerman pointed out that Defendant's criminal history (26 criminal history points under the Sentencing Guidelines, which is a number twice the threshold resulting in a defendant being a Category VI, the most severe of the Guidelines' criminal history categories) was so extensive that his status as a Category VI offender likely understated the severity of his criminal background.  *Id.* at 44.  Judge Feinerman noted that the apparent motive for the bank robberies

was a need to obtain money to fuel Defendant's drug habit., and that Defendant was "a recidivist" whose bank robberies "were not an aberration in an otherwise blameless life." *Id.* at 43, 46. Judge Feinerman noted that the 155-month sentence of incarceration was "towards the bottom end of the Guidelines range" but the very bottom of it. *Id.* at 48. Defendant appealed Judge Feinerman's application of the career offender guideline at sentencing, but on February 20, 2014, the U.S. Court of Appeals for the Seventh Circuit affirmed the sentence. Bank Robbery Prosecution, Seventh Circuit Opinion and Mandate (D.E. 84.)

In May 2020, Defendant wrote to the district court seeking relief from his sentence, and the Court construed the letter as a motion for compassionate release under the First Step Act. Bank Robbery Prosecution, 5/12/20 Order (D.E. 98). The Federal Defender's Office (in the person of Defendant's current counsel) stepped in to represent Defendant and to file a formal motion for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), on December 15, 2020. Bank Robbery Prosecution, Motion for Compassionate Release (D.E. 104). Defendant contended that grounds for compassionate release included his medical conditions amid the COVID-19 pandemic, his release plan, and the fact that he already had served more than 80% of his sentence. *Id.* at 8-10.

By the time Defendant's counsel filed the Motion for Compassionate Release, the four events charged in the indecent exposure complaint already had occurred at USP Tucson. Affidavit in Removal. The government, in response to that motion, argued to Judge Feinerman that extraordinary and compelling reasons did not exist under the First Step Act and Section 3553(a) to warrant compassionate release. Bank Robbery Prosecution, Government's Response to Defendant's Motion for Reduction in Sentence ("Gov't. First Step Resp."; D.E. 108) at 1. The government's detailed 14-page response covered a number of factual and legal fronts, but it also

concluded with a reference to Defendant's disciplinary record at USP Tucson: "Defendant also has had numerous disciplinary incidents while in prison for the instant offense, including engaging in inappropriate sexual acts (such as masturbating in front of a female correctional officer), refusing to obey orders, destroying items, possessing drugs or alcohol, [and] possessing a dangerous weapon." *Id*. at 13-14. The government's response did not go into further detail but placed before Judge Feinerman a 34-page exhibit containing the raw BOP records of Defendant's disciplinary history. *Id.*, Exh. B ("USP Tucson Disciplinary Records"; D.E. 110). The records referred to three of the four indecent exposure incidents charged in this matter, and as to each of those, the records indicated that some form of BOP discipline within USP Tucson was imposed, including the abbreviation "DS." *Id.* at 1, 3, 7-8. Defendant replied to Judge Feinerman, as to the disciplined conduct generally, that at least some of that conduct was explained but not excused by Defendant's mental health issues, and that disciplinary sanctions imposed on him during his time at USP Tucson included "disciplinary segregation," which Defendant has characterized as "essentially, solitary confinement." Bank Robbery Prosecution, Reply in Support of Motion for Compassionate Release (D.E. 114) at 5-7. The parties agree that USP Tucson imposed the following prison discipline on Defendant for the offense conduct charged in each of the four counts:

> Count One: 30 days of disciplinary segregation, 90 days of loss of visits privilege, and a loss of 27 days of time credited for good conduct;
>
> Count Two: 90 days of disciplinary segregation, three years of loss of commissary privileges, two years of loss of visits privilege, a loss of 41 days of time credited for good conduct, and a "forfeit[]" of 41 days of non-vested good conduct time;.
>
> Count Three: 120 days of loss of commissary privileges, 120 days of loss of phone privileges, and a loss of 27 days of time credited for good conduct; and
>
> Count Four: 21 days of disciplinary segregation, 120 days of loss of commissary privileges, and a loss of 41 days of time credited for good conduct.

Gov't Mem. at 5-6.

Judge Feinerman was aware of, and did consider, Defendant's prison disciplinary record in finding that extraordinary and compelling circumstances nonetheless existed under the First Step Act to justify reducing Defendant's sentence to time served. Bank Robbery Prosecution, 2/3/21 Amended Judgment (D.E. 117). In an accompanying order granting the Motion for Compassionate Release, Judge Feinerman set forth his reasons under Section 3553(a) for determining that Defendant "has already received sufficient punishment." Bank Robbery Prosecution, 2/3/21 Order (D.E. 116) at 2-3. Among those reasons was the following:

> [T]he court adds that Jemine at this juncture is not likely to pose "a danger to the safety of any other person or the community" if he were released. At 48 years old, Jemine poses a lower risk of recidivism than he did at the time of sentencing. *Although Jemine has sustained numerous disciplinary infractions in prison, he also has taken advantage of several educational and job-training programs, demonstrating concrete action and a sincere effort at rehabilitation.*

*Id.* (emphasis added) (internal citations omitted). Judge Feinerman's conclusion in this respect is obviously recent, having occurred slightly more than 10 months ago.

## III. The Initial Appearance Hearing in the Northern District of Illinois, and Its Aftermath in the District of Arizona.

Defendant was arrested in the Northern District of Illinois on the charges in this matter on June 11, 2021, and on that date, a Rule 5 initial appearance and removal hearing was held. (D.E. 2.) At the hearing, the undersigned magistrate judge provided defendant with the disclosure and information mandated for petty offenses by Rule 58(b). 6/11/21 Tr. (D.E. 28) at 4-9; Fed. R. Crim. P. 58(b). The Court also informed Defendant of the provisions of Rule 20, as required by Rule 5 in all initial appearances occurring in a district other than where the offense (felony or misdemeanor) was committed. 6/11/21 Tr. at 9-10; Fed. R. Crim. P. 5(c)(3)(A). Accordingly, the Court advised Defendant that Rule 20 permits a transfer of this matter from the District of

Arizona to the Northern District of Illinois upon Defendant's filing, in this district, a written notice of his intent to plead guilty or *nolo contendere*, and upon the written consent of the U.S. attorneys from both districts. 6/11/21 Tr. at 9-10; Fed. R. Crim. P. 20(a).

At the June 11 initial appearance and removal hearing, no mention was made by anyone of Rule 58(c), of its provisions for adjudication of the prosecution in the Northern District of Illinois, or of the absence of any requirement in Rule 58(c) that defendant invoke that rule in the district of presence or arrest before removal to the charging district. Rule 58(c) also does not require the consent of both U.S. attorneys, or either of them, for adjudication of a petty offense to occur in the district of presence upon satisfaction of the requirements of the rule. The matter of government consent or lack of consent to Rule 58(c) adjudication of Defendant's petty offense in the Northern District of Illinois also was not mentioned at the hearing. Of course, neither Rule 5 nor Rule 58 requires any mention of Rule 58(c), even as those rules set forth, with specificity, other mandatory disclosures to the defendant at initial appearance. *See* Fed. R. Crim. P. 5(d) and 58(b).[2]

After Defendant at the initial appearance waived an identity hearing, opening the door to the Court's finding that the matter should be removed to the District of Arizona, defense counsel made the following statement:

> One issue that I did want to raise with the Court before making a finding on removal is that given some of the unusual features of this case, we have asked the government to consider transferring jurisdiction under Rule 20. I don't know how that interacts with the Court making a finding on Mr. Jemine's removal, but I did just want to let the Court know that that's something we've asked the government to consider.

6/11/21 Tr. at 11. After noting that the Rule 20 transfer issue would be a matter defendant could raise with the government upon removal of the case to the District of Arizona, the Court found that

---

[2] Rule 5, for example, contains no requirement that judges advise defendants of the maximum and minimum penalties for the charged offense at felony initial appearances, yet Rule 58, governing misdemeanor initial appearances, contains this requirement. Fed. R. Crim. P. 5(d), 58(b).

removal was appropriate. *Id.* at 12. The matter was formally transferred to the District of Arizona on June 14. (D.E. 10.)

The government and Defendant have advised the Court of a few matters that have occurred in the case after the initial appearance and transfer of the case to the District of Arizona. At a status hearing on September 20, 2021, a magistrate judge in the District of Arizona reported, in a minute order, that:

> [T]he government informs the Court that in order to initiate a transfer, the defendant must first accept the government's plea offer. Currently, the parties are in plea negotiations. The Court requests the parties to file the appropriate transfer paperwork.

Resp. at 6, citing *United States v. Jemine*, No. 21-01563-MJ (D.E. 16) (D. Ariz.). But this information the government reported to Defendant was of questionable accuracy. If, as Defendant contends, he is entitled to a Rule 58(c) adjudication in the Northern District of Illinois, transfer of the matter to this district would not require government consent. Fed. R. Crim. P. 58(c). Therefore, Defendant would not have to accept the government's plea offer to initiate transfer to this district under Rule 58(c). The Court has not reviewed a transcript of the September 20 hearing in Arizona, but it appears perhaps that neither the parties nor the court had considered the availability of Rule 58(c). On October 8, 2021, the government in the District of Arizona tendered a draft plea agreement to Defendant, calling for a guilty plea to Counts One and Three of the complaint, with an agreement by Defendant to a sentence of six months of imprisonment on each of those two counts and with an ability of both parties to argue at sentencing whether the six-month sentences should be concurrent or consecutive. Resp. at 6. The plea agreement also was contingent upon the victims' approval. *Id.* Trial in this matter is currently set for January 10, 2022 in the District of Arizona. *Id.* Defendant has not pleaded guilty in the District of Arizona under the foregoing draft plea agreement. Instead, he filed his Rule 58(c) notice in this Court on October 25, 2021,

stating that he intends to waive venue and plead guilty in the Northern District of Illinois, and contending that the prosecution must occur now in the Northern District of Illinois because, according to Defendant, no sentence of imprisonment will be imposed in this matter. Notice of Intent at 14.

The Court initially ruled that it would take no action in this matter in response to the Notice of Intent because the matter was already transferred to the District of Arizona. 10/28/21 Order (D.E. 14.) Defendant moved to reconsider (D.E. 15), the Court received briefing (D.E. 20, 22, 25) and held an oral, telephonic hearing (D.E. 19). The Court then granted the reconsideration motion and vacated its earlier order stating that no action would be taken. 12/3/21 Order (D.E. 27). The Court also found that no new pre-sentence investigation report is needed for the Court to make a-pre-plea determination as to the sentence. *Id.* The Court also ordered sentencing memoranda, which it has now received. (D.E. 29, 30.) But in the Court's December 3 order, the Court did not grant Defendant relief in form of a determination that this matter shall be transferred back to the Northern District of Illinois, or that the prosecution will proceed in this district, per Rule 58(c). 12/3/21 Order (D.E. 27.) And that is because such a determination cannot be made without a pre-plea finding that no sentence of incarceration will be imposed in this case, under the plain language of Rule 58(c).

## DISCUSSION

Now having received the sentencing memoranda, the Court will tackle the various questions presented in the briefing: (1) does the court in the district of defendant's presence, after an initial transfer of a petty offense prosecution to the charging district, have the discretion to decline to re-assert jurisdiction upon a proper Rule 58(c)(3) notice by a defendant, based on factors

such as whether the defendant is forum shopping;[3] (2) does a defendant seeking prosecution in the district of presence under a Rule 58(c) notice of intent forfeit an entitlement to prosecution in the district of presence if the defendant does not invoke Rule 58(c) before removal to the charging district; (3) does Rule 58(c) authorize the court in the district of presence to make a pre-plea sentencing determination in order to determine whether Rule 58(c) adjudication in the district of presence may occur; and (4) is this a matter in which the Court could even find that no sentence of incarceration will occur to trigger Rule 58(c) adjudication in the Northern District of Illinois. The Court will take these questions in turn.

## I. Rule 58(c)'s Plain Language Does Not Vest District Courts or Magistrate Judges with Discretion to Decline to Re-Assert Jurisdiction in the District of Presence, No Matter Whether a Defendant May Be Forum Shopping.

The U.S. Supreme Court's guidance for courts on the interpretation of the plain text of a statute or rule is recent and clear. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton County, Ga.*, ___ U.S. ___, 140 S. Ct. 1731, 1737 (2020). As Justice Gorsuch put it in writing for the majority and holding that Title VII of the Civil Rights Act's prohibition on employment discrimination on the basis of "sex" included protection of gay and transgender persons, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Id.*

---

[3] The magistrate judge has jurisdiction over this petty offense matter under 28 U.S.C. § 636(a)(1), insofar as Rule 58 confers upon magistrate judges the powers and duties to adjudicate petty offenses without a requirement of a defendant consenting to adjudication before a magistrate judge. *See* Fed. R. Crim. P. 58(b)(2)(E)(i) and 58(b)(3)(A). The government does not take issue with this Court's exercise of jurisdiction over this matter except to note, correctly, that this Court's exercise of jurisdiction under Rule 58(c)(2) depends on whether it finds that no sentence of imprisonment will be imposed in this case. Resp. at 1; *see also* Gov't Mem. at 6 (arguing that this case is not one in which no sentence of incarceration will be imposed and stating that "the government respectfully requests that the Court decline to accept jurisdiction over this matter"). The question presented here is whether the court in the district of presence has the discretion to decline to re-assert jurisdiction.

> If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

*Id.* at 1738.

The text of Rule 58(a)(2) is as follows:

> **Petty Offense Case Without Imprisonment.**  In a case involving a petty offense for which no sentence of imprisonment will be imposed, the court may follow any provision of these rules that is not inconsistent with this rule and that the court considers appropriate.

Fed. R. Crim. P. 58(a)(2).

The text of Rule 58(c)(2) provides more specifically, for the following "additional procedures" in "a case involving a petty offense for which no sentence of imprisonment will be imposed":

> **Waiving Venue.  (A) Conditions of Waiving Venue.**  If a defendant is arrested, held, or present in a different district from the one where the indictment, information, complaint, citation, or violation notice is pending, the defendant may state in writing a desire to plead guilty or nolo contendere; to waive venue and trial in the district where the proceeding is pending; and to consent to the court's disposing of the case in the district where the defendant was arrested, is held, or is present.
>
> **(B) Effect of Waiving Venue.**  Unless the defendant later pleads not guilty, the prosecution will proceed in the district where the defendant was arrested, is held, or is present.  The district clerk must notify the clerk in the original district of the defendant's waiver of venue.  The defendant's statement of a desire to plead guilty or nolo contendere is not admissible against the defendant.

Fed. R. Crim. P. 58(c)(2).

Looking at the plain meaning of the text of these rules, they do not afford the district court discretion in ensuring the application of Rule 58(c)(2) when the petty offense is qualifying, i.e., when it involves a matter in which, in the event of conviction, no sentence of imprisonment will be imposed.  In such a petty offense case, Rule 58(a)(2) specifically prohibits courts from

following "these rules" in a manner "inconsistent" with Rule 58.  The Court may also act in a manner it "considers appropriate," but that phrase comes after the word "and."  Courts clearly must adjudicate petty offenses in a manner consistent with the whole of Rule 58.  Rule 58(c)(2) provides further that in the case of a petty offense in which no sentence of imprisonment "will" be imposed, once the defendant waives venue in compliance with Rule 58(c)(2)(A), the effect of that waiver under Rule 58(c)(2)(B), assuming that the defendant does not persist in a plea of not guilty, is that "the prosecution *will* proceed" in the district of the defendant's presence.  Here is the common understanding of the word "will":

> An auxiliary verb commonly having the mandatory sense of "shall" or "must."  It is a word of certainty, while the word "may" is one of speculation and uncertainty.

Black's Law Dictionary 1598 (6th ed. 1990); *see also Johnson v. United States*, 529 U.S. 694, 707-08 (2000) (resorting to Webster's Third New International Dictionary to help interpret the meaning of "revoke" in federal statute concerning supervised release in criminal cases); *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020) ("We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries.").

Courts also may consider a statute's purpose in interpreting or applying its text. "Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country."  *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 861 (2005).  "But scrutinizing purpose does not make practical sense … where an understanding of official objective emerges from readily discoverable fact, without at judicial psychoanalysis of a drafter's heart of hearts."  *Id.* at 862.  The touchstone of statutory analysis is always the text contained in the statute.  *Id.* (citing *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987) (looking to "plain meaning of the statute's words, enlightened by their context and the

contemporaneous legislative history [and] the historical context of the statute"); *Melvin*, 948 F.3d at 852 ("If the statutory language's plain meaning is unambiguous, our inquiry ends there."). We mention purpose here only because it is relevant to our application of the text of Rule 58(c)(2) to hold that district courts do not have discretion to refuse to permit adjudication of qualifying petty offenses in the district of presence, upon a proper invocation of the rule, insofar as our reading of Rule 58(c)(2), happens to "enjoy[] the virtue of serving the evident [legislative] purpose." *Johnson*, 529 U.S. at 708.

The purpose of Rule 58(c)(2)'s avenue for a petty offense defendant to waive venue in the charging district, and to enter a plea in the district of presence, is plain from the commentary to the 1980 amendments to what were then the Rules of Procedure for the Trial of Misdemeanors Before United States Magistrates, 85 F.R.D. 417 (U.S. Sup. Ct. Apr. 1, 1980). Rule 3(c) of the 1980 rule allowed defendants in petty offense cases to waive venue in the charging district so that they may "promptly plead guilty without waiting for the transmission of papers" from the charging district, according to the commentary. 85 F.R.D. at 424. Delay in petty offense cases was a problem that "may severely inconvenience the defendant who, *especially in a petty offense case*, may wish to plead guilty and complete the proceedings against him at the earliest possible time." *Id.* (emphasis added). Rule 58(c)(2) reflects an amended version of the old Rule 3.

The Advisory Committee to Rule 58(c)(2) in 1990 "recognize[d] that subdivision (c)(2) might result in attempted forum shopping," as the government calls to our attention in arguing that this language counsels in favor of a restrictive approach to Rule 58(c)(2) wherein the Court ought to exercise discretion to decline to accept jurisdiction in the Northern District of Illinois at the slightest hint of forum shopping. Resp. at 7-8. Equally if not more instructive was the Committee's deliberate omission from Rule 58(c)(2) of the requirement, as found in Rule 20, that

the U.S. attorneys in both districts consent before a waiver of venue could be accomplished. Fed. R. Crim. P. 58, 1990 Advisory Committee Notes. This omission was made "[i]n order to maintain a streamlined and less formal procedure which is consistent with the Remainder of the rule." *Id.* To be sure, the 1990 Advisory Committee was concerned about forum shopping, as it said in the commentary. But the drafters of Rule 58(c)(2)(B) could have written the rule to provide that the prosecution "may" proceed in the district of arrest or the district in which defendant is present. But they did not. They said "will." That language, when read against the backdrop of the rule as a whole, as well as the rule's stated purpose of avoiding long delays or other burdens associated with having to appear far from home to defend against petty offense charges, further supports our conclusion that as long as the petty offense will not result in a prison sentence, this Court has no discretion to refuse to accept jurisdiction.

The Advisory Committee, and the government in its briefing here, cited *United States v. Shaw*, 467 F. Supp. 86 (W.D. La. 1979), a rare case discussing a predecessor to Rule 58(c)(2) and warranting some discussion. In *Shaw*, two duck hunter defendants were charged with petty offenses concerning violations of federal hunting regulations covering migratory birds. The U.S. attorney in the Western District of Louisiana charged them with exceeding daily duck-hunting limits. Some of the facts of the case are not entirely clear, but the defendants ran into the Western District of Texas and sought to plead guilty there under what was then Rule 6 of the Federal Rules of Procedure for the Trial of Minor Offenses Before United States Magistrate Judges, perhaps because the Western District of Texas was more convenient to them, or perhaps because they thought they might receive a more lenient sentence in that District. 467 F. Supp. at 88-89. The defendants filed a confusing motion in the Western District of Texas to transfer the case there, and a magistrate judge in the Western District of Texas directed the magistrate judge in the Western

District of Louisiana to send the file to the Texas federal court. *Id.* at 89. The Louisiana federal magistrate judge transferred the file but entered an order retaining jurisdiction and setting the case for trial, while the magistrate judge in Texas set a sentencing in the Texas federal court and proceeded to sentence the duck hunters to a fine. *Id.* The two duck hunters asked a district judge in the Louisiana federal court to vacate the order retaining jurisdiction, but the judge instead vacated the Texas federal court orders and required further proceedings to be held in the Western District of Louisiana. *Id.* at 91. The reason: The duck hunters were relying on the Rule 6 language allowing them to proceed in the district in which they were "present," and they took this to mean any district they wished; the Louisiana district court saw that interpretation as raw forum shopping that "will not be countenanced." *Id.*

But *Shaw* is an odd duck.

The circumstances of *Shaw* are nothing like those here. The duck hunters in *Shaw* were from Louisiana but drove to Texas to try to avail themselves of what they thought was a friendlier forum, even if they had no real ties there. The argument in *Shaw* about the meaning of "presence" as used in Rule 6 was over whether the duck hunters could dictate that their prosecution take place in virtually any federal district they wished, simply by going there. *Id.* at 89-90. In the instant case, Defendant is an Illinoisan who was in the Northern District of Illinois when he was arrested, and he happens to be present now in that district. He is not attempting to argue that he be allowed to plead guilty in some other district he thinks is friendlier to persons convicted of indecent exposure. The unusual circumstances of *Shaw* make it a genuine outlier, and this Court will not read into Rule 58(c)(2) a grant of judicial discretion to refuse plea and sentence in the Northern District of Illinois when the rule says prosecutions of qualifying petty offenses "will" be prosecuted here upon a proper notice under the rule.

Everything about this case is in line with the circumstances anticipated by the drafters of Rule 3 from the 1980 rules, carried over to Rule 58(c)(2):  The goal was to streamline and simplify the process for defendants not charged with serious felony offenses, less serious felonies, misdemeanors or even petty offenses that will result in imprisonment.  For defendants charged with petty offenses that will *not* result in imprisonment, Rule 58(c)(2) offers no discretion at all upon filing of the notice – except to the extent judges are making a discretionary determination on whether the sentence ought to include imprisonment.  But that is a different question.  The circumstances of this case fall squarely into what Rule 58(c)(2)'s drafters contemplated:  A petty offense defendant whose prosecution must be returned to the district of his presence (in this case, his home district) for disposition if he will not receive a sentence of incarceration upon his plea of guilty of *nolo contendere*.[4]

The Court does not interpret Rule 58(c)(2) as allowing it to exercise its discretion to decline to accept jurisdiction over this matter, upon Defendant's filing of the Notice of Intent, on the ground that he is or may be forum shopping.  In so finding, the Court acknowledges the government's arguments that the presence of victims or witnesses in the District of Arizona gives that district an interest in the matter, and that Defendant sought to have the matter transferred back to the Northern District of Illinois after he learned that the government would seek a custodial

---

[4] *Shaw* may well be explained by the *Shaw* court having to react to the highly unusual circumstance of the duck hunters choosing the district of "presence" simply by driving there, even though they had no ties there. The court in *Shaw* narrowed the meaning of "presence" in the rule in a manner comparable to how Lord Blackstone would have interpreted a Bologna medieval law to allow surgeons to work openly in the streets despite the law's text stating that "whoever drew blood in the streets should be punished with the utmost severity." *See* William Blackstone, *Commentaries on the Laws of England* 60 (1765), cited in *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 352 (7th Cir. 2017) (Posner, J., concurring).  As Judge Posner noted, courts have interpreted constitutional and statutory text in this manner in numerous modern instances, so that today, "[w]e are Blackstone's heirs."  *Id.* at 354 (citing cases).  This Court is not called upon to engage in analogous gymnastics here, and we will not do so and thus snuff out, at the mere hint of possible forum shopping, Defendant's ability to have the plea and sentence in his petty offenses take place in this district.

sentence.  *See* Resp. at 11-12.  But the language of Rule 58(c)(2) is directory and contains no multifactorial test under a *forum non conveniens* analysis.  And knowing "that the U.S. Attorney's Office in the District of Arizona will seek a custodial sentence," *see id.* at 11, is not the same as believing, as the duck hunters apparently believed in *Shaw*, that the ultimate sentence they would receive in the district of "presence" would be more lenient than in the charging district.  The Court in the end believes that the concern about forum shopping here is overblown.  Defense counsel put on the record as early as the June 11 initial appearance, months before being tendered a plea agreement, that he wanted the case to proceed in this district.  6/11/21 Tr. at 11.  Moreover, Defendant would have no way of knowing in advance how the Northern District of Illinois would sentence him; he relies heavily on Judge Feinerman's findings, but those findings are available to the sentencing court no matter where it sits.  The government has not established that Defendant is forum shopping, and nor that the Court has the power to refuse jurisdiction even if he were doing so.

## II.     Defendant Did Not Waive or Forfeit His Ability To Avail Himself of Rule 58(c)(2) By Not Invoking It Earlier.

The government points out that Defendant did not file his Notice of Intent until after the government, in the proceedings in the District of Arizona, made clear that it will seek a term of imprisonment in this case.  Resp. at 1.  The government argues mostly that the timing of Defendant's invocation of Rule 58(c)(2) demonstrates that he is forum shopping, as part of the government's argument that the Court ought not to assert jurisdiction in this district so as to defeat Defendant's attempt to forum shop.  *Id.* at 8, 14.  We reject that argument above.  The practical consequence of the government's position, though, is that if Defendant wanted to avail himself of Rule 58(c)(2), he needed to do so at his initial appearance in this district, before the case was transferred to the District of Arizona, meaning that he waived or forfeited the rule's benefits by

not doing so. If such a requirement were grafted onto Rule 58(c)(2), the only forum shopping that could occur under the rule would have to occur before removal and transfer to the charging district. The Court agrees that finding that Defendant waived or forfeited the rule's benefits would address the government's concern about forum shopping, but we would need a lawful basis for such a finding, and we do not see it here.

Waiver is an intentional relinquishment of a known right, and forfeiture occurs when a defendant does not timely object. *United States v. Moody*, 915 F.3d 425, 429 (7th Cir. 2019). Where the government can proffer a plausible strategic reason that a defendant did not raise a particular issue, courts may interpret the failure to raise it as a knowing waiver. *Id.* at 430. The government has made such a proffer here, but the proffer is not a strong one. At the June 11 initial appearance, defense counsel openly mentioned Rule 20 as a possible avenue for adjudication of the matter in the Northern District of Illinois, but he made no mention of Rule 58(c)(2), and the record gives no indication that Defendant was aware of the rule at that time. Equally or more plausible is a scenario in which Defendant did not consider Rule 58(c)(2) until later, as in October 2021, when the government communicated that it would not consent to a Rule 20 transfer unless Defendant accepted a plea agreement calling for up to a year of incarceration. In any event, the record offers no clear basis for the Court to infer that Defendant knew of Rule 58(c)(2) or had it in mind at the time of the June 11 initial appearance in Chicago, and the Seventh Circuit in criminal cases has "consistently held that waiver principles should be construed liberally in favor of the defendant." *United States v. Jenkins*, 772 F.3d 1092, 1096 (7th Cir. 2014).

As for forfeiture, the Rules of Criminal Procedure explicitly counsel against applying it in circumstances like these. Nothing in Rule 58(c)(2) or anywhere else in the rule states that defendants must invoke the rule immediately upon entering custody, or at any particular time, in

order to avail themselves of its benefits. Nothing in the rule requires the notice of intent to waive venue to be filed in either district – unlike Rule 20, which requires the defendant's statement in a non-petty offense case to be filed in the transferee district. Fed. R. Crim. P. 20(a)(1). Moreover, Rule 58(c)(2) must not be construed in a manner inconsistent with any of the Rules of Criminal Procedure, Fed. R. Crim. P. 58(a)(2), and "[n]o sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local district rules unless the alleged violator was furnished with actual notice of the requirement before the noncompliance." Fed. R. Crim. P. 57(b). A sanction of forfeiture of the benefits of Rule 58(c)(2), to Defendant's disadvantage, would be inimical to Rule 57(b), because nothing in Rule 58(c)(2) requires defendants to invoke that rule at any particular time. Rule 5 requires defendants, at all initial appearances upon arrest in a district other than the charging district, to be notified of the provisions of Rule 20 but makes no mention of Rule 58. Fed. R. Crim. P. 5. Rule 58(b)(2)'s list of required disclosures for defendants at misdemeanor and petty offense initial appearances does not include the ability to waive venue under Rule 58(c)(2). Fed. R. Crim. P. 58(b)(2). At the June 11 initial appearance in this matter, Defendant was told of Rule 20 but not Rule 58(c)(2). 6/11/21 Tr., passim. In the absence of any requirement that Defendant invoke Rule 58(c)(2) at the June 11 initial appearance, and with Defendant not having received notice of the prospect that a court might impose such a requirement upon him or engraft one into the rules, a finding of forfeiture here would be inconsistent with Rules 58 and flat-out barred by Rule 57(b) and thus by Rule 58(a)(2) as well. The Court does not find that Defendant forfeited the benefit of Rule 58(c)(2) for failing to invoke the rule at a time when he was not advised of it, was not required to be advised of it, and was not required to make an election under it in the first place.

### III. Rule 58(c)(2) Authorizes the Court To Make a Pre-Plea Sentencing Determination.

The only reasonable way to read Rule 58(c)(2) is to find that it does authorize this Court to make some level of pre-plea determination of sentence. If this Court cannot find that this matter will not involve a sentence of incarceration, or if this Court finds that this matter necessarily does involve a sentence of incarceration, the petty offenses here do not qualify for a waiver of venue so that a guilty or *nolo contendere* plea would be entered in this district. Rule 58(c)(2)(B)'s "effect" of creating a scenario in which the prosecution "will" take place in the district or presence is not triggered unless the petty offense is a matter for which no sentence of incarceration will occur. The government does not expressly disagree, arguing that insofar as the Court makes a pre-plea sentencing determination, a determination of a no-incarceration sentence is inappropriate. Resp. at 14.

In *United States v. Arnold*, No. 3:15-cv-00109-MMD-WGC, 2015 WL 6123208 (D. Nev. Oct. 16, 2015), the district court affirmed a magistrate judge's entry of a judgment of conviction in a matter in which a defendant was arrested in Nevada for petty offense camping violations that had occurred in California and Montana, and he agreed to an adjudication in which he pleaded *nolo contendere* in the District of Nevada and received a $140 fine. 2015 WL 6123208, at *1, 3. He later sought to set the plea aside on the ground that his waiver of venue under Rule 58(c)(2) was oral and not a signed, written waiver. *Id.* at *2. The district court found the oral statements to be adequate and refused to set aside the plea. *Id.* at *3. In *Arnold*, no incarceration was sought by the government, and the magistrate judge, upon accepting the waiver of venue, simply sentenced the defendant to the $140 fine. But *Arnold* is at least consistent with the idea that under Rule 58(c)(2), the magistrate judge in the district of presence has the authority to determine whether the sentence will be custodial, so that the magistrate judge may then accept the guilty or

*nolo contendere* plea and proceed to the determination under Rule 58(c)(2)(B) that the prosecution will proceed in the district of presence.

## IV. This Court's Pre-Plea Determination of Sentencing Is That This Matter Will Not Involve a Sentence of Incarceration.

A court determines a federal sentence by applying the factors set forth in 18 U.S.C. § 3553(a), although the sentencing court need not elaborate on every factor; "it is sufficient to briefly explain those factors that it considered most relevant." *United States v. Barrera*, 984 F.3d 521, 524 (7th Cir. 2020). Section 3553(a) provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed—
>
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B) to afford adequate deterrence to criminal conduct;
>
>     (C) to protect the public from further crimes of the defendant; and
>
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)    the kinds of sentences available;
>
> (4)    the kinds of sentence and the sentencing range established for—
>
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>
>         (i)    issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be

incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

      (ii)    that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

  (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

  (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

  (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

The Sentencing Guidelines do not apply to Class B or C misdemeanors, or to infractions, so we need not analyze the fourth and fifth of the factors. U.S.S.G. §1B1.9. Restitution is not applicable in this case, so we need not discuss the seventh. We discuss the remainder in turn:

*The nature and circumstances of the offense and the history and characteristics of the defendant.* The nature of the offenses here, though charged as Class B misdemeanors, are serious. They had a significant impact on the victims, who for obvious reasons did not look at their workplace and daily routines in the same way after having been subjected to the indecent exposures. Count One on its face seems to be the most serious of the four charged offenses, insofar

as Defendant is said to have "charged" at the victim and to have uttered an offensive threat to commit a sexual assault upon her. The other counts also are serious, as no employee should be subjected to the charged behavior in any setting.

As Defendant has indicated in the Notice of Intent and again in his Sentencing Memorandum, with no dispute from the government, Defendant obtained employment as a machine operator promptly upon his return to Illinois. His employment as a machine operator included a promotion and appeared to have been proceeding uneventfully until his arrest, at his workplace, in the instant offense.[5] He proceeded to work at another employer, also in a supervisory role, before moving to his current job at Abbott Laboratories, where he "works as a 'lead' on the factory floor, supervising a team that works on the production of Abbott's COVID-19 testing kits." Def. Mem. at 4. In the meantime, he is undergoing substance abuse and mental health treatment, and his workplace arrest in this matter represents his only law enforcement contact. *Id.* A letter from Defendant's therapist indicates that the treatment is on a successful course. *Id.*, Exh. B.

The Court has confirmed by viewing the docket and by checking with the Probation Department no violation reports have been filed or are pending on Defendant's supervised release. For his part, Defendant has submitted a statement of allocution stating that he is committed to

---

[5] The Court is advised that police served an arrest warrant on Defendant for the charges offenses by going to his place of work and arresting him in front of his co-workers. Def. Mem. at 3. The Court does not second-guess executive branch tactics in such matters. Many defendants who are represented, and whose attorney representation is known to the government, are allowed the opportunity to self-surrender, even where the charges involve serious felonies. *See United States v. Edward M. Burke,* No. 19 CR 1 (D.E. 9) ("Defendant Edward Burke appears following self-surrender") (N.D. Ill. Jan. 3, 2019). Here, police showed up at Defendant's workplace to execute a warrant on four petty offenses and arrested him in front of his co-workers, at a time when Defendant was on supervised release on the bank robbery offense and presumably could have been notified of the petty offense charges through his probation officer or through counsel. The Court is not aware of any punitive intent behind the executive branch's choice to carry out the arrest in this manner. The degree to which the circumstances of this kind of arrest in a petty offense case may have a punitive effect on a defendant does not make a difference in the outcome of this matter, as the Court is making a pre-plea determination of the sentence without regard to the facts of the arrest.

keeping his life on track.  *Id.*, Exh. C.  These facts only add to the weight this Court would give to Judge Feinerman's findings in February 2021 that (1) Defendant poses a lower risk of recidivism than he did when he was sentenced in the 2010 bank robbery cases, notwithstanding his substantial earlier criminal history, and that (2) he has demonstrated "concrete action and a sincere effort at rehabilitation."  *See* Bank Robbery Prosecution, 2/3/21 Order at 2.  Finally, the record here shows that Defendant did receive a form of punishment for the charged conduct while he was incarcerated, and this this punishment included 156 days of "disciplinary segregation."  The Court need not make a value judgment on the penological merits and demerits of disciplinary segregation, or about whether it is or is not correctly described as "solitary confinement" or the functional equivalent of "solitary confinement," to conclude that at the very least, disciplinary segregation is intended as punishment and functions as punishment.[6]  Defendant thus did receive some significant punishment for the conduct, well before police officers showed up at his workplace to haul him away under an arrest warrant on these petty offenses.  Overall, the nature

---

[6] The government characterizes "disciplinary segregation" as something other than "solitary confinement" and states that in general, USP Tucson imposes disciplinary segregation in two-person cells, does not have single-occupancy cells, and does not place prisoners alone in cells "whenever possible." Gov't Mem. at 4. Some have characterized that distinction as not making a difference in terms of the harshness of the punishment. "Isolation through solitary confinement is prevalent across both administration and disciplinary segregation." Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S. Prisons* at 6, U.S Dep't of Justice Office of Justice Programs (March 2016) (available at https://www.ojp.gov/pdffiles1/nij/249749.pdf). At the USP Tucson Special Housing Unit, where prisoners are separated from the rest of the prison population under disciplinary segregation for reasons of discipline, as of 2017 prisoners were confined to their two-person cells for 23 to 24 hours a day, with five hours of recreation per week, for one-hour periods on separate days. District of Columbia Corrections Information Council, USP Tucson Inspection Report 19, 20 (Apr. 4, 2017) (available at https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/CIC%204.4.17%20Report%20on %20USP%20Tucson%20Inspection%20Report%20clean%20FINAL.pdf (dc.gov)). One non-contact visit and one 15-minute phone call per month were permitted, with one call allowed to be received every 30 days by request. *Id.* at 20. Objectively, housing in disciplinary segregation in the USP Tucson SHU is clearly punitive, and Defendant, in acknowledging that it is punitive, does not dispute this form of punishment was appropriate to address his conduct in this matter. *See* Def. Mem. at 8 ("it was appropriate for the BOP to impose those extensive penalties"). Nor has the government disagreed.

and circumstances of the charged petty offenses, and the history and characteristics of the person the Court would sentence today on those offenses, amount to a neutral factor that does not weigh in favor of a sentence of incarceration.

*The need for the sentence imposed to promote respect for the law and the other values set forth in Section 3553(a)(2).*  A sentence of incarceration is not needed to promote respect for the law and to reflect the seriousness of the offense.  Other sentences are available, including probation and a condition of probation involving substance abuse and mental health treatment to the extent directed by the Probation Department.  Defendant already is actively and successfully pursuing productive employment with one of the Chicago area's largest and most prominent companies, in an activity fulfilling an important need during the COVID-19 pandemic.  A sentence of incarceration is not needed to provide just punishment for the offense, to protect the public, or to provide adequate deterrence, as the facts surrounding Defendant's post-release conduct do not suggest that he poses a high risk of re-offense or of harm to the public, just as Judge Feinerman saw a lowered risk of recidivism even before Defendant was released.  Defendant's clean record on supervised release speaks further to this factor as not weighing in favor of a sentence of incarceration.

*The kinds of sentences available.*  Again, the available sentences include a term of up to three years of probation and education or treatment.  Ariz. Rev. Stat. §§ 13-802(A), 13-603(E)(7)(a), 13-717(A).  Probation would give the Court and the public an extra dose of protection against the risk of re-offense, as any probation violations could be assessed and evaluated as yardsticks of how well Defendant is doing on probation and whether his conduct signals any difficulty in conforming his conduct to the law.  (So far, his post-release record indicates no signs of trouble in this respect.)  An education or treatment requirement could further

be directed by the Probation Department, and the Court will presume that the Probation Department will assess Defendant's current treatment program and its efficacy.

*The need to avoid unwarranted sentencing disparities.* The government has advised that Defendant's matter is one of only two indecent exposure matters charged federally in the District of Arizona in the past eight years, with none charged between 2017 and the instant offenses. Resp. at 13. Independently, the Court learned of only one other such federal prosecution, but that matter was charged under an Oklahoma felony statute, and therefore its sentence of a year and a day is not helpful to the analysis here. *See United States v. Brummitt*, No. 5:19-cr-212-G-1 (D.E. 26, 37) (W.D. Okla. 2020). Consequently, there is no data in the record to suggest that a sentence without imprisonment in this case will contribute to an unwarranted sentencing disparity. The Court will not go down the road of analyzing the charging decision in the District of Arizona as a potentially vindictive prosecution, as that avenue would have been best pursued by defense motion if Defendant planned on contesting the charge, rather than pleading guilty or *nolo contendere*.

The Court on this record finds that a sentence of incarceration will not be imposed in this case.

## CONCLUSION

Accordingly, the Court will enter an order re-asserting jurisdiction over this matter as the effect of Defendant's filing of his Rule 58(c)(2) Notice of Intent (D.E. 13), insofar as the Court's discretion is limited to the question of whether this matter will or will not involve a sentence of incarceration. Having made a pre-plea determination that this petty offense matter will not involve a sentence of incarceration, the prosecution by rule will proceed in the Northern District of Illinois. The Clerk of the Court in the Northern District of Illinois will be requested to transmit this Order to the Clerk of the Court for the District of Arizona, with a request the District of Arizona vacate

all scheduling and other orders, including the January 10, 2022 trial date, so that this Court may proceed to schedule a date for plea and sentence in this matter in this district.

**SO ORDERED.**

ENTER:

GABRIEL A. FUENTES
United States Magistrate Judge

DATED:        December 22, 2021